**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS DIVISION**

**GARY J. BOGGS,**

        **Plaintiff,**

**v.**                                       **Civil Action No. 2:12-cv-25**
                                                 **JUDGE BAILEY**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

        **Defendant.**

**REPORT AND RECOMMENDATION RECOMMENDING THAT THE DISTRICT**
**COURT DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [11],**
**GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[14],**
**AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

## I.   INTRODUCTION

On March 27, 2012, Plaintiff Gary J. Boggs ("Plaintiff"), by counsel Joyce H. Morton, Esq.

and Montie VanNostrand, Esq., filed a Complaint in this Court to obtain judicial review of the final

decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or

"Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. §

405(g). (Complaint, ECF No. 1.) On May 31, 2012, the Commissioner, by counsel Helen Campbell

Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the

proceedings. (Answer, ECF No. 7; Administrative Record, ECF No. 8.) On June 29, 2012, and July

26, 2012, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment.

(Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 11; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF

No. 14.) Following review of the motions by the parties and the administrative record, the

undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.   BACKGROUND

## A.    *Procedural History*

On April 18, 2008, Plaintiff protectively filed a Title II claim for disability insurance benefits ("DIB") and a Title XVI claim for supplemental security income ("SSI"), alleging disability that began on April 19, 2006. (R. at 80-84.) Both claims were initially denied on July 8, 2008 and again upon reconsideration on December 11, 2008. (R. at 53-55, 57-61.) On August 15, 2009, Plaintiff filed a request for a hearing (R. at 51-52), which was held before United States Administrative Law Judge ("ALJ") Karl Alexander on April 15, 2010 in Morgantown, West Virginia. (R. at 45.) Plaintiff, represented by Montie VanNostrand, Esquire, appeared and testified, as did Eugene Czuczman, an impartial vocational expert. (R. at 756.) On August 24, 2010, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act ("Act"). (R. at 20-39.) On February 7, 2012, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 9.) Plaintiff now requests judicial review of the ALJ's decision finding him not disabled.

## B.    *Personal History*

Plaintiff was born on July 24, 1957 and was 50 years old when he filed his DIB and SSI applications. (R. at 80, 83.) He received his GED in 2004. (R. at 89, 138-39.) Plaintiff has prior work experience as a night watchman, construction painter, sub maker, and laborer. (R. at 112.)

## C.    *Relevant Medical History*

### 1.    Relevant Medical History Pre-Dating Alleged Onset Date of April 19, 2006

Plaintiff was seen at the emergency room of the Charleston Area Medical Center on November 6, 1995 after being involved in a motor vehicle accident. (R. at 165.) He complained of neck, left wrist, and right shoulder pain. (*Id.*) A week later, physical therapist Doug James

completed a cervical spine evaluation of Plaintiff. (R. at 162-63.) Plaintiff's chief complaints at this evaluation were pain in his neck, shoulder, back, and left wrist. (R. at 162.) He complained of moderate, intermittent pain that was worse with movement and better when he was not moving. (*Id.*) James' plan was to restore full cervical range of motion and reduce Plaintiff's pain. (R. at 163.)

Plaintiff was referred to Charleston Area Medical Center Sports Medicine Center on November 14, 1995 with a diagnosis of cervical and left wrist strain. (R. at 154.) On December 20, 1995, James wrote a progress note in which he noted that Plaintiff had been treated with an independent home exercise program including various cervical, lumbar, and wrist exercises for stretching and range of motion. (*Id.*) On December 19, 1995, Plaintiff had a cervical range of motion within normal limits but still had complains of some central thoracic pain around the T6 area. (*Id.*) He also continued to complain of lower back pain and stiffness, but noted that this resolved as the day progressed. (*Id.*) Plaintiff had a normal gait and approximately 80% of full wrist range of motion. (*Id.*) James noted that Plaintiff had been complying with his home exercise program and his effort to increase his activities of daily living. (*Id.*)

On January 23, 1996, James wrote another progress note in which he stated that Plaintiff had been seen for a total of nine visits. (R. at 151.) Plaintiff cancelled on December 22, 1995 because of snow and then did not return to the Sports Medicine Center until January 15, 1996. (*Id.*) At this re-evaluation, Plaintiff's cervical and lumbar range of motion were within normal limits and so were his left wrist range of motion and strength. (*Id.*) Plaintiff reported that he had been helping to shovel snow over four days, that he could do push-ups and a karate maneuver, and that he only experienced minor lower back pain. (*Id.*) Plaintiff indicated a desire to return to work, and James

discharged him from physical therapy because his treatment goals had been met. (*Id.*)

Plaintiff had an X-ray of his right knee done at Braxton County Memorial Hospital on May 23, 2002. (R. at 246.) This X-ray revealed a large joint effusion but no acute fracture. (*Id.*) A day later, Plaintiff had an MRI of his right knee taken. (R. at 244.) Dr. Timothy Conner noted that there was a large joint effusion "without evidence for acute soft tissue injury." (*Id.*)

On June 5, 2002, Plaintiff saw physical therapists Aaron Hartstein and Kevin Boring at Elk River Physical Therapy. (R. at 176.) At this first appointment, he reported that he had hurt his right knee while squatting and painting and that he had experienced swelling a few hours after the injury. (*Id.*) They noted that Plaintiff was diagnosed with right knee hemarthrosis because of a torn blood vessel. (*Id.*) On June 12, 2002, Boring and Hartstein noted that Plaintiff had been seen three additional times since June 5, 2002 and that Plaintiff had reported "his knee strength and ROM have increased and his pain has decreased noticeably." (R. at 175.) Plaintiff also reported that he was complying with his home exercise program. (*Id.*)

On June 27, 2002, Boring and Hartstein noted that Plaintiff had been seen six additional times since his last progress note on June 12, 2002. (R. at 170.) Plaintiff reported that he had returned to most of his everyday activities, but also reported that he could not do things such as climbing a ladder. (*Id.*) Plaintiff also noted "continual improvements in his right knee ROM, strength, and amount of swelling in suprapatellar region." (*Id.*) Boring and Hartstein assessed that Plaintiff's ROM and strength "have nearly normalized to equal bilaterally" and that the swelling above his knee had "greatly decreased" and his "quad control and strength [was] continually increasing." (*Id.*) They planned to continue physical therapy to increase Plaintiff's ROM and strength and to increase his ability to complete all functional activities to perhaps return to work.

(*Id.*)

Hartstein and Boring wrote their final progress note for Plaintiff on July 17, 2002. (R. at 167.) On that date, Plaintiff had been seen six additional times since June 27, 2002, but had been a cancellation or no-show three times. (*Id.*) Plaintiff reported vast improvement in his ability to perform functional activities, but Hartstein and Boring noted that performing a full squat caused him an increase in pain and discomfort. (*Id.*) Plaintiff's ROM and strength had normalized bilaterally, and Boring and Hartstein planned to discharge him from physical therapy to an independent home exercise program. (*Id.*) They also noted that Plaintiff could safely return to work upon his physician's discretion. (*Id.*)

## 2. Relevant Medical History Post-Dating Alleged Onset Date of April 19, 2006

Dr. Bennett Orvik completed a disability determination examination of Plaintiff on January 1, 2007. (R. at 193-200.) He noted that Plaintiff's main concern was pain in various joints, but that he also experienced shortness of breath with exertion. (R. at 193.) At this examination, Plaintiff complained that he felt weak and tired all the time and that he could not do much with his hands at times. (R. at 194.) After examining Plaintiff, Dr. Orvik stated that his behavior was "consistent with his allegations of disability." (R. at 195.) Plaintiff had a negative straight leg raise test for both legs, had a normal gait, and a normal range of motion for both his upper and lower extremities. (R. at 196.) He was able to bend to 90 degrees, squat and arise from a squat without difficulty, and get out of a chair and on and off the examining table without trouble. (*Id.*) Dr. Orvik diagnosed history of hemophilia with factor 8 deficiency; probable bilateral carpal tunnel syndrome; diffuse arthralgias of unclear etiology; history of multiple undiagnosed allergies; severe anxiety; and depression. (R. at 197.)

On January 17, 2007, Disability Examiner Stephanie Eddy completed a Physical Residual Functional Capacity Assessment of Plaintiff. (R. at 201-08.) She noted that Plaintiff could occasionally lift and carry fifty pounds; frequently lift and carry twenty-five pounds; stand, walk, and sit for about six hours in an eight-hour workday; and was unlimited in pushing and pulling. (R. at 202.) Ms. Eddy stated that Plaintiff was partially credible because his "limited functioning appears to be more psychological than physical." (R. at 206.) Two days later, Dr. Jim Capage completed a Psychiatric Review Technique of Plaintiff. (R. at 209-22.) He noted that there was insufficient evidence for a medical disposition. (R. at 209.) Dr. Capage also noted that Plaintiff had not listed any treatment or medication for any psychological conditions and that he had missed two scheduled psychological consultative examinations. (R. at 221.)

Plaintiff visited the Braxton County Memorial Hospital on February 1, 2007 with complaints of hives. (R. at 223-24.) Staff noted that Plaintiff had scattered urticaria. (R. at 224.)

On April 16, 2008, Dr. Arturo Sabio completed a physical examination of Plaintiff. (R. at 239-41.) He noted that Plaintiff had pain in his right shoulder and signs of edema. (R. at 239.) He opined that Plaintiff could not work full-time at his customary occupation or similar work, that Plaintiff was unable to perform other full-time work, and that his inability to work full-time was for a duration of six months. (*Id.*) Dr. Sabio also stated that Plaintiff was depressed and needed psychotherapy for his depression. (R. at 239.)

Plaintiff had X-rays of his right shoulder taken at Braxton County Memorial Hospital on May 7, 2008. (R. at 331.) Dr. Johnsey Leef noted that Plaintiff had "mild degenerative changes right AC joint." (*Id.*) Views of Plaintiff's right ankle, right knee, left ankle, and left knee were unremarkable. (*Id.*) Plaintiff had a CT scan of his chest done on June 9, 2008. (R. at 320.) This

scan revealed multiple scattered bilateral pulmonary nodules that were noncalcified. (*Id.*) Dr. Jennifer Smith noted that these nodules were concerning for metastatic disease, and she also diagnosed an enlarged right paratracheal node and emphysematous changes. (*Id.*)

On May 12, 2008, staff at the United Summit Center created a treatment plain for Plaintiff's depression. (R. at 347-53.) At this evaluation, Plaintiff reported anxiety, panic attacks, long-term depression, and suicidal ideations. (R. at 353.) Staff decided that Plaintiff would participate in individual therapy as well as receive a psychiatric evaluation to determine if medication would help reduce his concerns. (*Id.*) Plaintiff was diagnosed with generalized anxiety disorder; major depressive disorder, recurrent, sever with psychotic features; identity problem; schizotypal personality disorder; anemia hemolytic; social environment problems; and economic problems. (R. at 357.) He was also assigned a Global Assessment of Functioning ("GAF") score of 45. (*Id.*)

Dr. Sabio referred Plaintiff to Dr. Paul Brager at Oncology/Hematology Associates for his bilateral lung nodules on June 18, 2008. (R. at 256-58.) Dr. Brager ordered a CT scan. (R. at 258.) This scan was completed on July 3, 2008 by Dr. Joseph Dorchak at United Hospital Center. (R. at 259-60.) Dr. Dorchak assessed symmetrical hilar lymphadenopathy, right paratracheal lymphadenopathy, and mediastinal lymphadenopathy. (R. at 260.) He also assessed "[n]umerous bilateral subcentimeter pulmonary nodules or not metabolically active." (*Id.*) Plaintiff returned to Dr. Brager on July 7, 2008. (R. at 262-63.) At this visit, Dr. Brager found no sign of cervical, supraclavicular, axillary, or inguinal lymphadenopathy. (R. at 263.) He assessed possible sarcoidosis, referred Plaintiff to an orthopedic surgeon for evaluation and treatment, and instructed him to return in three months. (*Id.*)

On June 24, 2008, Morgan Morgan, M.A., completed a mental assessment of Plaintiff for

disability determination.  (R. at 269-75.)  Morgan noted that Plaintiff was cooperative and compliant and had no posture or gait abnormalities.  (R. at 269.)  Plaintiff complained of recurrent depressive episodes, problems with attention, concentration and recall, and being socially withdrawn.  (R. at 269-70.)  He also reported irritability, crying spells, and emotional sensitivities.  (R. at 270.)  During the examination, Morgan noted that Plaintiff's mood was dysphoric and irritable and that he had a restricted affect.  (R. at 271.)  Objectively, Morgan stated that Plaintiff was "an individual with a history of maladaptive personality features."  (R. at 272.)  Morgan diagnosed major depressive disorder, recurrent, moderate; somatoform disorder; alcohol dependence, without physiological dependence, in remission; and personality disorder.  (*Id.*)  Furthermore, Morgan deemed Plaintiff's social functioning to be severely deficient because of his presentation and his persistence and pace to be mildly deficient.  (R. at 273.)

That same day, Dr. Miraflor Khorshad completed a disability evaluation of Plaintiff.  (R. at 276-80.)  At this examination, Plaintiff complained of back pain, lack of sleep, a tendency to worry, right knee pain, left knee pain, and pain in his neck, elbows, wrists, hands, and ankles.  (R. at 276.)  Dr. Khorshad found that Plaintiff had a normal gait and was able to get on and off of the examining table, walk on his toes and heels, and sit and squat.  (R. at 277.)  He noted that Plaintiff had a "coarse tremor on both hands" but no swelling of his joints.  (*Id.*)  Plaintiff demonstrated a normal range of motion.  (*Id.*)  Dr. Khorshad diagnosed essential hypertension, poorly controlled; situational depression; and carpal tunnel syndrome, left wrist.  (R. at 278.)

Dr. Joseph Shaver completed a Mental Residual Functional Capacity Assessment of Plaintiff on July 1, 2008.  (R. at 281-84.)  He noted that Plaintiff was not significantly limited in his understanding and memory, sustained concentration and persistence, social interaction, and

adaptation. (R. at 281-82.) Dr. Shaver stated that Plaintiff was "generally credible regarding his reported mental functioning" but that he "retains the mental capacity to operate in routine, low stress, work situations that require only limited interaction and minimal production quotas." (R. at 283.) Dr. Shaver also completed a Psychiatric Review Technique that same day. (R. at 285-98.) In this report, he noted that Plaintiff suffered from MDD, recurrent, moderate; a somatoform disorder; a personality disorder; and alcohol dependence with physical dependence (in remission). (R. at 288, 291-93.) Dr. Shaver reported that Plaintiff was moderately limited in his ability to maintain social functioning and mildly limited in his abilities to maintain activities of daily living and concentration, persistence, and pace. (R. at 295.) He also noted that Plaintiff was "mostly credible." (R. at 297.)

On July 7, 2008, Cindy Osborne, DO, completed a Physical Residual Functional Capacity Assessment of Plaintiff. (R. at 308-15.) She determined that Plaintiff had the same exertional limitations that Disability Examiner Stephanie Eddy found in January of 2007. (R. at 309.) Ms. Osborne also noted that Plaintiff was partially credible because he "appears to be quite functional yet indicates significant limitations." (R. at 315.) She reduced Plaintiff's residual functional capacity to medium work. (*Id.*) An unknown source also determined that Plaintiff had these same exertional limitations on December 2, 2008. (R. at 371-78.) However, this source also determined that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation because of COPD. (R. at 375.)

On August 7, 2008, Jessica Greenlief at the United Summit Center noted that Plaintiff had reported making significant progress with his treatment plan. (R. at 345.) Plaintiff reported that he was feeling better as far as his depression, but was now experiencing anger. (*Id.*) Ms. Greenlief

noted that Plaintiff was oriented and cooperative during his appointment. (*Id.*) She instructed Plaintiff to continue therapy and to begin pharmacological management. (*Id.*)

Treatment notes from Dr. Salam Rajjoub reveal that on August 12, 2008, Plaintiff complained of sarcoidosis, hives, and chest pain. (R. at 359.) However, Dr. Rajjoub noted that Plaintiff had all normal systems after an examination. (R. at 358.) Dr. Rajjoub diagnosed lung nodules, hemophilia with Factor 8 deficiency, and a cough, among other things. (*Id.*)

On September 16, 2008, staff at the United Summit Center created an updated treatment plan for Plaintiff. (R. at 334-44.) They noted that Plaintiff had worked on re-establishing his relationship with his ex-wife and that his depression and thought disturbances had improved. (R. at 341.) However, they also noted constant suicidal ideations and that Plaintiff would not inform anyone if he attempted suicide. (*Id.*) They instructed Plaintiff to continue individual therapy and pharmacological management. (*Id.*)

Plaintiff saw Dr. Abdulmalek Sabbagh on October 1, 2008 for a cardiac consultation. (R. at 406.) Dr. Sabbagh assessed chest pain; history of shortness of breath; hyperlipidemia; history of anxiety; hypertension; and hyperglycemia, and scheduled Plaintiff for an echocardiogram. (*Id.*) Plaintiff had a myocardial rest and stress test on November 4, 2008. (R. at 408.) Dr. Sabbagh noted that Plaintiff "had good distribution of the Cardiolite throughout the myocardium without any significant area of fixed or reversible defect." (R. at 408.) He noted a negative exercise EKG test and also noted that Plaintiff did not have any chest pain during or after exercise. (R. at 409.)

Plaintiff saw Dr. Brager again for his bilateral lung nodules on October 13, 2008. (R. at 469-70.) At this appointment, Dr. Brager noted that Plaintiff had no cervical, supraclavicular, axillary, or inguinal lymphadenopathy. (R. at 470.) He assessed possible sarcoidosis and instructed Plaintiff

to return in six months.  (*Id.*)

On December 8, 2008, Dr. Philip Comer completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique of Plaintiff.  (R. at 379-96.)  Dr. Comer determined that Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods and his ability to perform activities within a schedule, maintain regular attendance, and be punctual.  (R. at 379.)  He was also moderately limited in his ability to interact appropriately with the public, his ability to accept instructions and respond appropriately to supervisors' criticism, his ability to respond appropriately to work setting changes, and his ability to complete a normal workday and workweek without interruptions.  (R. at 380.)  Dr. Comer opined that Plaintiff "appears to have the mental/emotional capacity for work related activity in a low stress/demand work environment that can accommodate his physical limitations."  (R. at 381.)  In the Psychiatric Review Technique, Dr. Comer noted that Plaintiff suffered from MDD, recurrent, moderate; a somatoform disorder; a personality disorder; and alcohol dependence in remission.  (R. at 386, 389-91.)  He determined that Plaintiff was mildly limited in his activities of daily living but moderately limited in maintaining social functioning and maintaining concentration, persistence, or pace.  (R. at 393.)  He also noted that Plaintiff had one or two extended-duration episodes of decompensation.  (*Id.*)

On February 2, 2009, Plaintiff had a rheumatological consultation with Dr. Shelly Kafka.  (R. at 417-22.)  At this consultation, Plaintiff complained of joint pain in his right shoulder, hands, knees, back, and ankles.  (R. at 417.)  Dr. Kafka's examination revealed that Plaintiff was positive for chest pain, hypertension, itching eyes, shortness of breath, hives, headaches, dizziness, muscle spasms, and pain in his hands and feet.  (R. at 419-20.)  Plaintiff had some tenderness in his lower lumbar spine, some crepitus in his right shoulder and bilateral knees, tenderness over both elbows,

and hypermobility of the bilateral ankles. (R. at 421.) Dr. Kafka opined that Plaintiff could have certain infections that led to the granulomas but that adenopathy existed. (R. at 422.)

Plaintiff had various X-rays taken that same day. (R. at 431-37.) An X-ray of his right shoulder showed no acute abnormality but also some mild degenerative changes at the AC joint. (R. at 431.) The X-rays of Plaintiff's right and left knees revealed normal alignment. (R. at 432-33.) An X-ray of Plaintiff's lumbar spine showed some mild degenerative changes manifested by tiny lumbar osteophytes. (R. at 434.) The X-ray of Plaintiff's cervical spine showed "[d]egenerative changes at C5-C6 and C6-C7 with reversal of the cervical lordosis." (R. at 435.) The X-ray of Plaintiff's right hand showed normal mineralization and no joint effusion. (R. at 436.) Finally, the X-ray of Plaintiff's left hand showed some minimal degenerative changes with no acute abnormality. (R. at 437.)

The next day, Plaintiff saw Dr. Naveen Akkina for a second opinion and an initial pulmonary consultation. (R. at 483-85.) After examination, Dr. Akkina noted that Plaintiff suffered from chest pain, headaches, numbness in his arms or legs, joint pain, depression, and forgetfulness. (R. at 484.) He also noted that Plaintiff's neck was inflamed but that his lungs were normal. (R. at 485.)

Plaintiff had a CT scan of his thorax taken at the Stonewall Jackson Memorial Hospital on February 5, 2009. (R. at 412.) Dr. Richard Person noticed "[n]umerous bilateral pulmonary nodules suspicious for metastatic disease." (*Id.*)

Plaintiff visited the emergency room at the Braxton County Memorial Hospital with complaints of hives on February 6, 2009. (R. at 454-57.) Staff there noted that Plaintiff had a history of breaking out in hives. (R. at 456.) Plaintiff presented there again with hives on April 25, 2009. (R. at 450-53.) Staff at that time noted that Plaintiff's hives were moderate to severe. (R. at

450.)

On February 13, 2009, Plaintiff had a re-assessment with Kara Johnston at the United Summit Center. (R. at 497-99.) Ms. Johnston noted that Plaintiff suffered from depression, suicidal ideations, and uncontrollable crying. (R. at 497.) Plaintiff was oriented, respectful, had an appropriate affect, but had a depressed mood. (R. at 498.) Ms. Johnston diagnosed him with moderate depression and a generalized anxiety disorder and recommended that he receive therapy and pharmacological management. (R. at 500.)

Plaintiff saw allergist Dr. Sally Dee on February 19, 2009 for an evaluation of his "persistent hives and allergic rhinitis." (R. at 438-49.) At this evaluation, Dr. Dee found that Plaintiff is "significantly allergic to grass pollen, dust mite and cockroach." (R. at 439.) He was also allergic to weed pollen, rabbit dander, and ladybugs. (*Id.*) Dr. Dee ordered further testing for white bean, black bean, red bean, brown bean, and turkey allergies. (*Id.*) Overall, Dr. Dee assessed moderate persistent seasonal and perennial allergic rhinitis; chronic recurrent urticaria secondary to allergies to aeroallergens; adverse drug reactions; asthma; and a history of severe swelling with hymenoptera sting. (R. at 440.) She advised him to completely avoid dust mites, cockroaches, and ladybugs; continued his asthma medications and Veramyst; and started him on new medications for hives and allergies. (*Id.*)

Plaintiff saw Dr. Doug Given of Braxton Health Associates on March 19, 2009. (R. at 539-43.) Plaintiff complained of skin rashes and breathing problems. (R. at 539.) After a physical examination, Dr. Given noted that Plaintiff had diminished breath sounds and anxiety. (R. at 542.) He diagnosed unspecified cause contact dermatitis and other eczema; shortness of breath; unspecified anxiety state; allergy, unspecified not elsewhere classified; lumbago; general joint pain;

hemophilia carrier status; pure hyperglyceridemia; and other emphysema. (R. at 542-43.) He recommended that Plaintiff follow up in one to two weeks and noted that he needed a different pulmonology. (R. at 543.)

Plaintiff returned to see Dr. Dee on March 25, 2009 for a follow-up appointment regarding his allergies. (R. at 512-14.) Dr. Dee noted that Plaintiff's hives significantly improved after he began using Zyrtec and Hydroxyzine. (R. at 512.) His hives were also well controlled with the use of Tylenol with hydrocodone. (*Id.*) Dr. Dee assessed chronic recurrent urticaria secondary to food allergies and aeroallergen allergies; mild persistent seasonal and perennial allergic rhinitis; hypersensitivity to hymenoptera; and aspirin and non-steroidal allergy. (*Id.*) She instructed Plaintiff to avoid the use of aspirin and non-steroidal medications; continued his Cetirizine and Hydroxyzine medications; gave him ointment to apply twice a day as needed; and advised him to carry his EpiPen with him at all times. (R. at 512-13.)

On April 7, 2009, Plaintiff saw Dr. Akkina for a follow-up appointment. (R. at 478-80.) Dr. Akkina noted that Plaintiff had normal lungs and neck. (R. at 479.) He also stated that Plaintiff had bilateral pulmonary nodules that had been stable since June of 2008. (*Id.*) Two weeks later, Dr. Akkina received the report from Plaintiff's PEI scan and noted that his bilateral pulmonary nodules were not metabolically active. (R. at 480.)

Plaintiff returned to see Dr. Brager on May 4, 2009. (R. at 466-68.) Dr. Brager assessed urticaria that was worsening and sarcoidosis that remained unchanged. (R. at 467.) He also assessed reactive leukocytosis because of Plaintiff's hives or another condition and instructed Plaintiff to return in six months. (*Id.*)

Kara Johnston at United Summit Center completed a review assessment of Plaintiff on May

13, 2009. (R. at 583-83.) Ms. Johnston noted that Plaintiff continued to exhibit depression, anxiety, and fleeting suicidal thoughts. (R. at 583.) However, Plaintiff admitted that therapy was helping him, and Ms. Johnson noted that therapy and pharmacological management were "effective in stabilizing mood and reducing symptoms." (*Id.*) At the assessment, Plaintiff was oriented and "exhibited pleasant effect." (*Id.*)

Plaintiff saw Dr. Dee again on May 20, 2009 for his allergies. (R. at 509.) She continued his medications and noted that his symptoms were improved since his last visit on March 25, 2009. (*Id.*) She noted that his symptoms were improved again on August 17, 2009. (R. at 508.)

Plaintiff saw Dr. Akkina again on June 15, 2009. (R. at 475-77.) Again, Dr. Akkina found that Plaintiff had normal lungs and neck. (R. at 476.) He noted that Plaintiff's bilateral lung nodules were possibly sarcoidosis. (*Id.*)

On June 24, 2009, Dr. Charles Scharf at the United Summit Center noted that Plaintiff was doing better, but that he took as little medication as he was able to get away with. (R. at 502.) Dr. Scharf thought that Plaintiff fought his medications to a degree and that his hives were because of a stress-related reaction. (*Id.*) He noted that Plaintiff was still hypomanic and that his lack of insight interfered with his treatment. (*Id.*) Plaintiff had a progress appointment with Kara Johnston on August 13, 2009. (R. at 503-04.) He continued to demonstrate depression, anxiety, and some suicidal thoughts along with agitation, hostility, and hopelessness. (R. at 503.) However, Plaintiff reported that therapy was helpful and that he felt better after completing therapy sessions. (*Id.*) Ms. Johnston noted that therapy and pharmacological management were helpful in stabilizing Plaintiff's mood. (*Id.*) Plaintiff was oriented and had a pleasant affect. (R. at 504.)

On July 30, 2009, Dr. Joseph Richard of the United Summit Center completed a

psychological evaluation of Plaintiff. (R. at 493-96.) He diagnosed Plaintiff with major depressive disorder, recurrent, moderate; panic disorder without agoraphobia; COPD; carpal tunnel; arthritis; asthma; hemophilia. (R. at 495.) He assigned a GAF score of 55 to Plaintiff. (*Id.*) Dr. Richard noted that Plaintiff continued to report many symptoms of depression and anxiety even though medication and therapy had helped to reduce symptoms. (R. at 496.) He also noted that results on two measures indicated that Plaintiff could be somewhat exaggerating his symptoms. (*Id.*)

Plaintiff saw Drs. John Parker and Carol Montjoy on August 3, 2009 to obtain a third opinion on his pulmonary nodules. (R. at 505-07.) Other pulmonologists thought that the nodules were "secondary to either sarcoid or fungal infection." (R. at 505.) Plaintiff denied any cough, chest pain, and hemoptysis. (*Id.*) Drs. Parker and Montjoy listed Plaintiff's conditions as pulmonary nodules with a history of a chest CT showing some hilar adenopathy, questionable sarcoid versus old fungal disease; hemophilia with factor 8 deficiency; history of hives; hypertension; high cholesterol; arthritis/carpal tunnel syndrome; and former smoker. (R. at 506.) They ordered Plaintiff to undergo full pulmonary function tests and a chest CT scan. (*Id.*) Plaintiff underwent these tests on August 12, 2010. (R. at 716-19.) A diagnosis of sarcoidosis of the lungs was noted. (R. at 716.) Plaintiff had good effort and cooperation and tolerated the tests well with no adverse effects. (R. at 717.)

Dr. Robert Tallaksen performed a CT scan of Plaintiff's chest on August 20, 2009. (R. at 525.) He noted that Plaintiff had multiple pulmonary nodules that were "well defined, variable in size, and . . . more numerous in the lower lung zones, attribute suspicious for metastatic disease." (*Id.*) He also noted coronary artery calcification and a suspicious lymph node in Plaintiff's middle mediastinum. (*Id.*)

Plaintiff had a follow-up appointment for his presumed sarcoidosis with Drs. Parker and Montjoy on October 12, 2009. (R. at 527-29.) At this follow-up Plaintiff stated that he had chronic dyspnea and was "unable to do his normal physical activities including grocery shopping." (R. at 527.) However, he denied a cough or hemoptysis. (*Id.*) Dr. Parker and Dr. Montjoy assessed sarcoidosis "based on not biopsy proven due to his history of hemophilia but presumably to sarcoid given his elevated ACE level and chest CT findings;" hemophilia; history of hypertension; and history of high cholesterol. (R. at 528.) They planned to repeat Plaintiff's PFTs with a follow-up chest X-ray in six months and to consider prednisone treatment if his symptoms did not improve or his PFTs worsened. (*Id.*)

On December 14, 2009, Plaintiff had a medication management appointment with Junemarie Williams at United Summit Center. (R. at 538.) Ms. Williams noted that Plaintiff needed a re-evaluation because he had not been seen since June 2009 and that he had been out of his Seroquel for two weeks. (*Id.*) Plaintiff reported that he had been doing really well until he ran out of medication because he had not experienced problems with irritability or agitation. (*Id.*) Ms. Williams noted that Plaintiff had a pleasant affect and was not displaying symptoms of anxiety or depression. (*Id.*) However, she also noted that Plaintiff did not always take his Seroquel and that he did not refill it in a timely manner, so he was "not very compliant with the medication." (*Id.*)

On February 11, 2010, Kara Johnston completed a Mental Residual Functional Capacity Assessment of Work-Related Abilities for Plaintiff. (R. at 553-58.) She noted that Plaintiff had mild limitations in understanding and remembering short directions; however, he had moderate limitations in carrying out short instructions, understanding and remembering detailed instructions, carrying out detailed instructions, and exercising judgment or making simple work-related decisions.

(R. at 554.) She opined that this was because of Plaintiff's poor concentration and because he was easily distracted. (*Id.*) Ms. Johnson also noted that Plaintiff was moderately limited in sustaining attention and concentration, maintaining regular attendance and punctuality, and completing a normal workday without interruptions or unreasonable number of breaks. (*Id.*)

Ms. Johnson determined that Plaintiff had marked limitations in responding to direction and criticism from supervisors, working with others without being distracted, working with others without distracting them, and relating predictably in social situations in the workplace. (R. at 555.) She opined that he had limitations in work-related social functioning because of his anxiety, poor coping skills, hostility, and tendency to be impulsive. (R. at 556.) She found that Plaintiff had marked limitations in his ability to respond to changes, and moderate to marked limitations in his ability to function independently in a work setting. (*Id.*) Finally, Ms. Johnson determined that Plaintiff was extremely limited in his ability to tolerate ordinary work stress because of his anxiety, depression, and poor coping and communication skills. (R. at 557.) Overall, she thought that Plaintiff was unable to work and that his impairments and limitations existed at the same level of severity since May 12, 2008. (*Id.*)

A day later, Dr. Doug Given completed a primary care physician questionnaire for Plaintiff. (R. at 559-67.) He noted that Plaintiff suffered from sarcoidosis, carpal tunnel, COPD, allergies, lung nodules, and other impairments. (R. at 559.) He recommended that Plaintiff only undertake sedentary activity for an eight-hour day and that Plaintiff needed to alternate positions frequently or occasionally (R. at 561-62.) Dr. Given stated that Plaintiff needed a sit/stand option, and that he would be able to sit for one hour at a time, stand for one hour at a time, and walk for thirty minutes at a time. (R. at 562.) If walking and standing were combined, Plaintiff would be able to be on his

feet for three hours, and would be able to sit upright for a maximum of five hours.  (*Id.*)  Dr. Given advised that Plaintiff should recline and have frequent rest periods as needed throughout the day.  (R. at 562-63.)  He also opined that Plaintiff could never climb, balance, or crawl, and could infrequently stoop or bend, kneel, crouch, stretch, reach, or squat.  (R. at 563.)

Dr. Given found that Plaintiff should avoid all exposure to machinery or vibrations, fumes and dust, and environmental hazards.  (R. at 563-64.)  Plaintiff would also need to avoid even moderate exposure to excessive humidity, hot and cold temperatures, and noise.  (R. at 564.)  Dr. Given noted that Plaintiff would be expected to experience chronic moderate and severe intermittent pain based on his impairments.  (*Id.*)  He found that Plaintiff could use both his right and left hands for grasping and handling, arm controls, and fine manipulation and fingering.  (R. at 565.)  However, he also noted that Plaintiff experienced numbness in his left hand.  (*Id.*)  Dr. Given stated that Plaintiff's impairments would cause him to be absent from work more than twice a month, and that his schizo personality would, when combined with his other impairments, result in a greater degree of disability.  (R. at 566.)  Overall, Dr. Given felt that Plaintiff was incapable of performing any full-time job on a sustained basis, and that he was incapable of performing full-time work from April 19, 2006 through the present.  (*Id.*)

Junemarie Williams at United Summit Center completed a Psychiatric Review Technique of Plaintiff on February 15, 2010.  (R. at 568-81.)  She noted that Plaintiff suffered from an organic mental disorder; a psychotic disorder because of his auditory delusions; a depressive syndrome; anxiety; and a personality disorder.  (R. at 569-75.)  Ms. Williams opined that Plaintiff had marked limitations in his ability to maintain social functioning and his ability to maintain concentration, persistence and pace, and that he had moderate limitations on his activities of daily living.  (R. at

578.) She also stated that Plaintiff had four or more episodes of decompensation. (*Id.*)

On March 16, 2010, psychologist Crystal Knight of Chameleon Health Care completed a psychological evaluation of Plaintiff after Plaintiff was referred there by his attorney. (R. at 591-99.) Plaintiff felt that he could not adequately perform work if he were to return to work because of his arthritis, ankle pain, knee problems, hemophilia, sarcoidosis, depression, and difficulties with memory. (R. at 591.) He complained of experiencing constant pain every day and that his medication decreased his pain but did not eliminate it. (R. at 592.) Plaintiff reported sleep difficulties and difficulty in completing tasks that he starts; he also described himself as easily distracted. (R. at 594.) Ms. Knight noted that Plaintiff was cooperative, conversational, and had a broad affect. (R. at 595.) She diagnosed him with major depressive disorder, recurrent, severe; generalized anxiety disorder, and personality disorder, not otherwise specified. (R. at 598.) She also assigned a GAF score of 57 to Plaintiff. (*Id.*) Overall, Ms. Knight thought that Plaintiff was experiencing a severe amount of depression and anxiety and that he would benefit from mental health counseling, a pain treatment clinic, and stress management skills. (R. at 598-99.)

Staff at Chameleon Health Care also completed a Psychiatric Review Technique of Plaintiff. (R. at 600-13.) They noted that Plaintiff suffered from an affective order involving depression because of loss of interest in activities, sleep disturbances, decreased energy, feelings of guilt and worthlessness, thoughts of suicide, and difficulties in concentrating and thinking. (R. at 603.) They also noted that Plaintiff suffered from a generalized anxiety disorder and personality disorder because of persistent disturbances of mood. (R. at 605, 607.) Staff found that Plaintiff was moderately limited in his activities of daily living, markedly limited in his ability to maintain social functioning and concentration, and experienced four or more episodes of decompensation. (R. at

610.)

On March 29, 2010, Plaintiff had imaging of his upper extremities done. (R. at 614.) This imaging revealed that Plaintiff's median DML, median CMAP amplitude, and median F-wave were abnormal bilaterally. (*Id.*) Plaintiff's median sensory response was abnormal on the left, and his median DSL and median SNAP amplitude were abnormal on the right. (*Id.*) His median-ulnar DML difference was bilaterally abnormal, and his median-ulnar DSL difference was abnormal on the right. (*Id.*) Overall, imaging showed that a "severe bilateral median neuropathy at the wrist" should be considered. (*Id.*)

Brandie Lockard at United Summit Center completed an assessment of Plaintiff on June 18, 2010. (R. at 657-59.) Ms. Lockard noted that at that time, Plaintiff appeared to be doing well with his emotions. (R. at 657.) She stated that Plaintiff was oriented, cooperative, and anxious during the assessment. (R. at 658.) Plaintiff was diagnosed with major depressive order, moderate recurrent; and generalized anxiety disorder. (R. at 659.) However, records show that Plaintiff was discharged as a client on November 9, 2010. (R. at 660.)

Plaintiff saw Dr. William Given on July 28, 2010 with no chief complaints. (R. at 689-91.) Dr. Given assessed carpal tunnel syndrome; osteoarthritis; pure hyperglyceridemia; anxiety; allergies; other emphysema; pure hypercholesterolemia; chronic airway obstruction; sarcoidosis; depression; hyperlipidemia; factor 8 deficiency; pulmonary nodules; and borderline glaucoma. (R. at 690.) A physical examination revealed that Plaintiff had some hives. (*Id.*)

Plaintiff visited Care Xpress on November 1, 2010 with complaints of right knee pain that had lasted for three days. (R. at 711.) He denied any swelling, but stated that it was tender to touch. (R. at 712.) Plaintiff had an X-ray of his right knee taken at the Braxton County Memorial Hospital

on November 3, 2010.  (R. at 713.)  Dr. Jennifer Smith noted that there was "not acute fracture or dislocation or significant degenerative disease."  (*Id.*)

On November 9, 2010, Plaintiff was discharged from treatment at the United Summit Center. (R. at 620.)  Plaintiff's final assessment was that he was self-injurious and had psychiatric symptoms.  (*Id.*)  Staff recommended that he continue with therapy.  (*Id.*)

Physical therapist Kevin Boring completed a Functional Capacity Evaluation of Plaintiff on December 3, 2010.  (R. at 628-45.)  Mr. Boring noted that Plaintiff put forth full physical effort.  (R. at 628.)  He determined that Plaintiff performed at the "physical demand level of below sedentary based on occasional material handling lifting criteria."  (*Id.*)  Specifically, he noted that Plaintiff had decreased cervical range of motion and UE range of motion and strength and that he showed "tightness to LE musculature, inability to use the hand and fingers in gripping activities without increased pain, decreased fine motor abilities of the hands and fingers, decreased non material handling activities of squatting, kneeling, crouching and crawling, decreased postural awareness and pain in multiple areas."  (*Id.*)  Mr. Boring recommended that Plaintiff receive physical therapy to address his pain and postural awareness, decrease his soft tissue tightness, and restore his strength and range of motion.  (R. at 629.)  Overall, Mr. Boring found that Plaintiff's subjective reports of pain and disability were reasonable and reliable.  (R. at 644-45.)  On May 4, 2011, Mr. Boring wrote an addendum to his report to note that Plaintiff had taken his pain medication prior to the evaluation. (R. at 721.)

On December 29, 2010, Plaintiff returned to see Dr. Given.  (R. at 708-10.)  He complained of pain in his feet and knees.  (R. at 708.)  He also had some neck pain between his shoulders.  (R. at 709.)  Dr. Given noted that Plaintiff's knees were tender and that the middle of his right knee

pinched in with pain. (*Id.*) He assessed osteoarthritis; other emphysema; pure hypercholesterolemia; and factor 8 deficiency. (*Id.*) Dr. Given also stated that Plaintiff was disabled. (R. at 710.)

On February 16, 2011, Plaintiff underwent a CT scan of his thorax at Braxton County Memorial Hospital. (R. at 725.) The doctor completing the scan made the following impressions: (1) "Lymphadenopathy in the mediastinum which is unchanged from the previous study of 9-10-2008;" (2) "Nodules in the lungs bilaterally which are unchanged from the previous study of 9-10-2008. This may be consistent with sarcoidosis;" (3) "No signs of infiltrates, pneumothorax or pleural effusions noted;" and (4) "Possible cholelithiasis. Ultrasound of the gall bladder may be of benefit." (*Id.*)

Plaintiff underwent a stress test at Braxton County Memorial Hospital on March 3, 2011. (R. at 723-24.) This study showed a "[s]mall area of diminished activity . . . along the distal inferior apical wall on the short axis and horizontal long axis not clearly appreciated on vertical long equivocal for small area of stress-inducted ischemia." (R. at 724.) However, the overall impression was that Plaintiff had a normal stress test. (R. at 723.)

Plaintiff saw Dr. Given with complaints of back pain on April 13, 2011. (R. at 742.) He was picking up sticks in someone's yard when he began to experience pain. (*Id.*) Dr. Given noted a "positive paraspinal muscle spasm with tenderness" and provided Plaintiff with prescriptions for Toradol and Indomethacin25. (R. at 743.) Seven days later, Plaintiff returned for a follow-up at which he complained of pain if he twisted, knee pain, numbness up to his ankles, and burning sensations in his feet. (R. at 744.) He also complained that his carpal tunnel had flared up after picking up branches in the yard and breaking them in two. (*Id.*) Dr. Given noted that Plaintiff had

a decreased range of motion in his back and assessed lumbago. (R. at 745.)

On May 10, 2011, Plaintiff saw PA-C Kassandra Katona at the West Virginia University Heart Institute with complaints of chest pain and shortness of breath. (R. at 729-732.) Plaintiff described his chest pain as sharp, stabbing, and occurring a few times a month when he is at rest. (R. at 729.) After an examination, Ms. Katona noted that Plaintiff had a regular heart rate and rhythm and had a normal chest wall that was non-tender to palpation. (R. at 731.) On May 18, 2011, Plaintiff underwent a stress test pursuant to Ms. Katona's orders. After this test, Dr. Conard Failinger noted that Plaintiff did not have any significant valvular heart disease, nor was there any echocardiographic evidence for stress-induced ischemia. (R. at 735-36.)

Plaintiff was admitted to the emergency room at Braxton County Memorial Hospital on August 27, 2011 with complaints of bee stings. (R. at 648-55.) According to Plaintiff, he was stung when he was using a weed eater and encountered a nest of yellow jackets. (R. at 652.) His Epi-pen was expired and he was stung nine to ten times. (*Id.*) He was discharged that same day and was given a prescription for Vicoprofen for pain. (R. at 655.)

## D. *Testimonial Evidence*

At the hearing before the ALJ, Plaintiff testified that he experiences burning, stinging pain and numbness in his hands. (R. at 764.) He noted that the more he uses his hands, the worse the pain is. (R. at 765.) However, he also experiences pain when he is not doing anything, such as at night. (*Id.*) Plaintiff testified that he could only use his hands for something like writing for five or ten minutes before he would have to stop. (*Id.*) If he needed to grip something like a screwdriver, he stated that he would immediately feel numbness. (R. at 766.) Plaintiff noted that is grip is "pretty good;" however, he would only be able to grip something over and over for only a few

minutes.  (*Id.*)  At times, Plaintiff will experience pain up to his shoulders from handling things that exert strain on his elbows and wrists.  (R. at 767.)

Plaintiff testified that he also has pain in his right shoulder.  (R. at 767.)  He experiences this pain even from just lifting his arm up.  (*Id.*)  Plaintiff noted that he experiences pain in his right shoulder even when sitting still at times.  (R. at 768.)  The pain becomes worse when Plaintiff lifts up his arm and reaches out to pick something up.  (R. at 768-69.)  He has not noticed any problems with his left shoulder.  (R. at 769-70.)  Plaintiff also experiences stiffness in his neck and testified that this stiffness keeps him "from sleeping a lot."  (R. at 769.)

At the hearing, Plaintiff testified that he suffers from allergies from dust mites, grasses, and pollen.  (R. at 770.)  Because of his allergies, he tries to stay indoors as much as possible.  (*Id.*)  Plaintiff testified that he is "really scared to take a walk somewhere" because his ankles and knees sometimes cause him pain.  (*Id.*)  However, he tries to spend time outside, but the longer he is outside, the more his eyes itch and his allergies bother him.  (R. at 771.)  He still experiences hives despite all his allergy medications.  (*Id.*)  Plaintiff testified that the hives itch and at times have caused his eyes to swell shut.  (*Id.*)  He stated that he has had to go to the emergency room for swelling from hives.  (*Id.*)  He receives steroids for his hives only when he has a severe reaction because steroid treatments are not working as well anymore.  (R. at 772.)  Plaintiff testified that Dr. Sharp at United Summit Center told him that his hives could also be stress-related.  (R. at 773.)  He noted that he is stressed from his conditions and not being able to do things that he wants to do or that he has done all his life.  (*Id.*)

Plaintiff testified that his medications make him really drowsy and sleepy.  (R. at 775.)  He also noted that some of them made him more apt to be agitated, but that he considered himself to

usually be a "pretty easy-going person." (*Id.*) Plaintiff stated that he gets between two hours and five hours of sleep a night because his pain in his neck, back, hands, and arms keeps him awake. (*Id.*) He testified that his energy level is "fair" in the daytime, and that sometimes he will fall asleep in the afternoon after eating something sweet. (R. at 775-76.) He naps about two to three times a week and will nap anywhere from ten minutes to an hour. (R. at 776.) During the day, Plaintiff pets the cat, sometimes dusts, and watches about four or five hours of television. (*Id.*)

When asked by the ALJ, Plaintiff testified that the amount of time he could sit before he needed to get up and move around varied depending on how active he is. (R. at 777.) He noted that he could sit from five to ten minutes and sometimes up to an hour before he needed to get up. (*Id.*) He also noted that he does not have difficulties with standing still, but that it hurts to stand some days, especially if he is standing at the sink. (*Id.*) Plaintiff testified that he cannot walk very far before he needs to sit and rest. (*Id.*) He stated that Dr. Gibbons told him to walk more and that he will walk half a mile to the Go Market and has four places along the way where he sits and rests. (R. at 777-78.)

### E.    *Vocational Evidence*

Also testifying at the hearing before the ALJ was Eugene Czuczman, an impartial vocational expert. Mr. Czuczman classified Plaintiff's past work as a construction painter as medium work with an SVP of seven; sandwich artist as medium work with an SVP of two; night watchman as light work with an SVP of three; and laborer as heavy work with an SVP of three. (R. at 779.) The ALJ then posed the following hypotheticals to Mr. Czuczman:

> Q:    All right, then let me ask you to assume a hypothetical individual of the claimant's age, educational background and work history wouldn't be able to perform medium work, but should not climb ladders, ropes or scaffolds to the maximum extent possible should walk on be walking on level and even

surfaces. Should not be exposed to temperature extremes, wet or humid conditions, environmental pollutants or hazards. Should work in a low-stress environment with no production line or assembly line type of pace, and no independent decision making responsibilities, would be limited to unskilled work involving only routine and repetitive instructions and tasks. Should have no interaction with the general public and no more than occasional interaction with coworkers and supervisors. Would there be any work in the regional or national economy that such a person could perform?

A:     For the region, I'm utilizing the state of West Virginia with the five recognized metropolitan square areas for the state. The following fit within the hypothetical as given. Wire galvanizer, that's tending a machine. 45,000 national, 20 regional. Equipment washer 90,000 national, 500 regional.

Q:     How many is that?

A:     That was two, your honor.

Q:     That's enough, I think. Anything in your testimony inconsistent with anything contained in the DOT?

A:     No, your honor.

(R. at 779-80.)

Mr. VanNostrand, Plaintiff's attorney, then posed the following hypotheticals to Mr.

Czuczman:

Q:     All right, could I have exemplary DOT numbers for those two positions that you outlined?

A:     Yes, you may. The wire galvanizer is recognized under DOT 501.485-010, and the equipment washer is a DOT of 381.687-022.

. . .

Q:     The judge did not ask you, whether on the basis of that hypothetical, he could do any of his past work, but I'll go ahead and do that.

A:     No, he could not. I mean, the closest was a sandwich maker but then we have no contact with the general public that prevented that work.

Q:     All right, on the basis of the same restrictions as light work, would there be

any of the past jobs that could be done?  With the light RC, well, I guess it's the same restrictions that be in all, [INAUDIBLE]--

A:      Right, right.

Q:      Okay, all right, well, I'd like for you to assume a hypothetical individual under the age of 50 with the same age, education and work, judge, I'm not going to ask any questions excuse me.  I'm going to stop right here because I feel that there's no pat work, and we have an assessment from the treating physician.

ALJ:    There's no past work.

Atty:   Well, he can't do it.

ALJ:    He can't do it, yeah, I understand.

Atty:   With the RFC that he has, there's no past work, and so the only assessment we have is less than sedentary.  So, I'm not going to ask any questions.

(R. at 781-82.)

A Report of Contact Form dated July 9, 2008 noted that Plaintiff could perform his past work as a night watchman both as he performed it and as it is performed in the national economy.  (R. at 121.)  Another Report of Contact Form dated December 11, 2008 noted that this assessment remained appropriate.  (R. at 127.)

## F.      Lifestyle Evidence

In an Adult Function Report dated May 15, 2008, Plaintiff reported that he spends a typical day watching television for most of the time.  (R. at 102.)  He dusts, sweeps, or sits outside on some days, goes grocery shopping at the beginning of the month, and goes to the doctor on some days. (*Id.*)  Plaintiff takes care of a dog and cat by feeding them, and he is helped by the friend with whom he lives.  (R. at 104.)  He reported that his conditions affect his abilities to dress, bathe, care for his hair, and shave because of the numbness he experiences.  (*Id.*)

Plaintiff stated that he can cook, but he often prepares sandwiches, frozen dinners, and microwaveable meals because of the pain in his wrist and right shoulder.  (R. at 105.)  He sweeps the floor once a week, does laundry once a week, takes out trash once a week, dusts every couple of weeks, and cleans the bathroom once a week.  (*Id.*)  Plaintiff does not do yard work.  (R. at 105-06.)  He reported that needs help or encouragement to do these chores and will talk to himself or leave notes for himself.  (*Id.*)  Plaintiff goes outside at least once a day if it is not raining.  (R. at 106.)  He shops once a month for food, and then he will go again for more food and personal care items.  (*Id.*)  Shopping takes him approximately one and a half hours.  (*Id.*)

Plaintiff reported that he cannot pay bills because he has no money or handle a savings account because he does not have one; however, he can count change and use money orders.  (R. at 106.)  He also does not have a checking account.  (*Id.*)  Plaintiff's hobbies include television and building crafts, airplanes, and kites; however, he has not painted since 2006 and it takes him longer to build things.  (R. at 107.)  He spends time with others by going to the store, watching movies, and talking.  (*Id.*)  Plaintiff goes to see his therapist and goes shopping on a regular basis.  (*Id.*)

## G.    *Other Evidence*

On June 2, 2010, Plaintiff's therapist, Helen Newman, wrote a letter in which she stated that Plaintiff's "numerous Mental Health issues" "would make it unlikely to acquire and maintain gainful employment."  (R. at 615.)  Her opinion was that "employment at this time could interfere with him becoming mentally stable."  (*Id.*)

## III.    CONTENTIONS OF THE PARTIES

Plaintiff, in his motion for summary judgment, asserts that the ALJ's decision "denying disability benefits is not supported by substantial evidence."  (Pl.'s Mot.)  Specifically, Plaintiff

asserts the following assignments of error:

- The ALJ omitted Plaintiff's carpal tunnel syndrome as a severe impairment, did not discuss carpal tunnel syndrome or indicate the weight given to the recent EMG, relied upon an incomplete hypothetical residual functional capacity ("RFC"), and abused his discretion by relying on jobs that require "frequent" handling;

- The ALJ erred by relying on jobs that did not fit the hypothetical RFC given to the vocational expert and involved frequent exposure to "other" hazardous environmental conditions or occasional exposure to toxic/caustic chemicals and frequent wet/humid conditions;

- The ALJ abused his discretion by failing to call a medical expert to assist in interpreting the medical evidence; and

- The Appeals Counsel erred in not remanding the case on the basis of new and material evidence of a functional capacity evaluation that provided objective support for the opinion of Plaintiff's treating physician.

(Pl.'s Br. Supp. Mot. for Summ. J. ("Pl.'s Br."), ECF No. 11-1 at 10-15.) Plaintiff asks the Court to reverse the ALJ's decision or remand the matter to the Commissioner for a new hearing. (Pl.'s Mot.)

Defendant, in his motion for summary judgment, asserts that the ALJ's decision "is supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot.) Specifically, Defendant asserts that:

- The ALJ properly assessed Plaintiff's RFC and supported this assessment with substantial evidence;

- The jobs identified by the vocational expert were consistent with the ALJ's restrictions for environmental conditions; and

- Plaintiff's submission of post-decision evidence would not have reasonably changed the ALJ's decision.

(Def.'s Br. Supp. Mot. for Summ. J. ("Def.'s Br."), ECF No. 15 at 9-15.)

## IV. STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied. *See* 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. *See Laws v. Celebrezze*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962).

*Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit has defined substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws,* 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability

determinations." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore,

**"the language of § 205(g) . . . requires that the court uphold the decision even should the court**

**disagree with such decision as long as it is supported by 'substantial evidence.'"** *Blalock v.*

*Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V.   ANALYSIS

### A.   *Standard for Disability and the Five-Step Evaluation Process*

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-

step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ."
20 C.F.R. §§ 404.1520, 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920 (2011). If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. *Id.*

**B.    *Discussion of the Administrative Law Judge's Decision***

Utilizing the five-step sequential evaluation process outlined above, the ALJ made the following findings:

> **1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.**
>
> **2.    The claimant has not engaged in substantial gainful activity since April 19, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).**
>
> **3.    The claimant has the following severe impairments: diffuse arthralgias of unclear etiology; minimal degenerative changes of the cervical and lumbar spine; mild degenerative changes of the right AC joint; mild hereditary hemophilia; complaints of shortness of breath with normal spirometry; major depressive disorder; somatoform disorder, not otherwise specified; anxiety disorder; personality disorder, not otherwise specified; alcohol dependence in supposed remission (20 CFR 404.1520(c) and 416.920(c)).**
>
> **4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**
>
> **5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c)**

performing all posturals, except no climbing of ladders, ropes, or scaffolds; within all reasonable extent possible, walking only on level and even surfaces; no exposure to temperature extremes, wetness or humidity, environmental pollutants or hazards, such as dangerous moving machinery or unprotected heights; jobs should be low stress, with no production line/assembly pace or independent decision making responsibilities; work should be unskilled with routine, repetitive instructions and tasks; with no interaction with the general public and only occasional interaction with coworkers and supervisors.

6.  The claimant is unable to perform any past relevant work (**20 CFR 404.1565 and 416.965**).

7.  The claimant was born on July 24, 1957 and was 48 years old, which is defined as a younger individual, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (**20 CFR 404.1563 and 416.963**).

8.  The claimant has at least a high school education and is able to communicate in English (**20 CFR 404.1564 and 416.964**).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (**See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2**).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (**20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)**).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 19, 2006, through the date of this decision (**20 CFR 404.1520(g) and 416.920(g)**).

(R. at 22-39.)

## C.  *Analysis of the Administrative Law Judge's Decision*

### 1.  **Substantial Evidence Supports the ALJ's Consideration of Plaintiff's Carpal Tunnel Syndrome**

As his first assignment of error, Plaintiff asserts that the ALJ erroneously did not include his

carpal tunnel syndrome as a severe impairment and erroneously did not make a finding that it was non-severe. (Pl.'s Br. at 10-11.) Specifically, Plaintiff alleges that the ALJ provided an incomplete hypothetical RFC to the vocational expert ("VE") by not including limitations on the use of hands and fingers and that therefore the ALJ erroneously relied on the jobs provided by the VE because these jobs require frequent handling. (*Id.* at 11-12.) The undersigned finds that Plaintiff's argument is without merit.

### a. The ALJ Properly Considered Plaintiff's Carpal Tunnel Syndrome When Assessing Plaintiff's RFC

First, Plaintiff argues that the ALJ did not fairly include all his limitations in his RFC because he omitted limitations caused by Plaintiff's carpal tunnel syndrome. (Pl.'s Br. at 10-12.) Specifically, Plaintiff asserts that the ALJ's "citations to the record appear to be selectively culled to eliminate the claimant's reports of hand and finger complaints." (*Id.* at 11.) However, the undersigned finds Plaintiff's argument to be without merit.

Under the Social Security Act, a claimant's RFC represents the most a claimant can do in a work setting despite the claimant's physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1) (2011). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis;" that is, for "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 21996). The Administration is required to assess a claimant's RFC based on "all the relevant evidence" in the case record." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). This assessment only includes the "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p, at *1. Even though the Administration is responsible for assessing

RFC, the claimant has the burden of proving her RFC.  *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1993) (per curiam) (citing *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983)) (claimant has the burden of production and proof through the fourth step of the sequential analysis; *see also* 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3) (claimant is responsible for providing evidence to be used to develop RFC).

As an initial matter, Plaintiff cites to the Functional Capacity Evaluation submitted to the Appeals Council to support his contention that his carpal tunnel syndrome has caused him to experience limitations in handling and fingering.  (Pl.'s Br. at 11; *see also* R. at 630-45.)  However, this Court "cannot review any evidence not contained in the record as reviewed by the ALJ in determining whether substantial evidence supports the ALJ's findings."  *Bishop v. Barnhart*, 78 F. App'x 265, 268, 2003 WL 22383983, at *2 (4th Cir. Oct. 20, 2003) (citing *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir. 1972)).  Therefore, because this evaluation was not included in the record as reviewed by the ALJ, Plaintiff cannot argue that the ALJ should have relied on this evidence when assessing Plaintiff's RFC.

Plaintiff is correct that on March 29, 2010, Dr. Katiny stated that a "severe bilateral median neuropathy at the wrist" should be considered.  (R. at 614.)  The ALJ cited this report in his decision.  (R. at 31.)  The ALJ also cited to Dr. Sabio's examination of Plaintiff in April of 2008 in which he found no abnormal findings but noted that Plaintiff could not work because of his right wrist pain.  (R. at 36; *see also* R. at 240.)  Therefore, Plaintiff is incorrect in his assertion that the ALJ did not discuss carpal tunnel syndrome.  Indeed, the ALJ found that Plaintiff's diffuse arthralgias were a severe impairment at the second step of the sequential evaluation.  (R. at 22.)

In his decision, the ALJ discussed the medical evidence related to Plaintiff's carpal tunnel

syndrome. On December 29, 2006, Dr. Orvik completed a consultative examination of Plaintiff for the determination of disability. (R. at 193.) At this examination, Plaintiff complained of pain in various joints, but denied problems with joint swelling and admitted to seeing neither a rheumatologist nor a physician for his problems. (*Id.*) Dr. Orvik found that Plaintiff's sensory examination was "fairly unremarkable" and that he did not have any areas of joint inflammation or swelling. (R. at 196.) He assessed "probable bilateral carpal tunnel syndrome" but also noted that Plaintiff's physical examination was "relatively unremarkable." (R. at 197.) On June 24, 2008, Dr. Khorshad examined Plaintiff and diagnosed carpal tunnel syndrome in his left wrist. (R. at 278.) While he found a positive Tinel sign on Plaintiff's left wrist, he did not find any joint swelling or effusion. (R. at 277.) Dr. Khorshad also noted that Plaintiff's fine manipulation was normal. (R. at 279.)

Plaintiff saw Dr. Kafka, a rheumatologist, for a consultation on February 2, 2009. (R. at 417.) Although she noted that Plaintiff had been diagnosed with carpal tunnel syndrome (R. at 418), she also found that Plaintiff's wrists were within normal limits and had a good range of motion (R. at 412). Furthermore, X-rays of Plaintiff's right hand were "unremarkable," and X-rays of his left hand showed "minimal degenerative changes" but no joint effusion. (R. at 436-37.)

Additionally, Cindy Osborne, D.O., a state agency consultant, noted that Plaintiff was "quite functional" despite carpal tunnel syndrome and pain in his wrists. (R. at 315.) Most notable, however, is the opinion of Dr. Given, Plaintiff's treating physician. On March 19, 2009, Plaintiff told Dr. Given that he had "no recent history" of "joint stiffness, joint swelling, [or] joint deformities." (R. at 540.) After an examination, Dr. Given determined that Plaintiff had a full range of motion in his hands and fingers without any swelling or joint deformities. (R. at 542.) Tellingly,

on February 12, 2010, Dr. Given stated that Plaintiff had no limitations with using his hands for repeated or prolonged action involving simple grasping and handling and fine manipulation and fingering.  (R. at 565.)

Plaintiff also asserts that the ALJ failed to indicate the weight given to his testimony concerning his joint pain in his wrist.  (Pl.'s Br. at 11.)  However, the ALJ specifically mentioned that he did "not find the claimant to be entirely credible."  (R. at 36.)  The determination of whether a person is disabled by pain or other symptoms is a two-step process.  *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* 20 C.F.R. § 404.1529(c)(1); SSR 96-7p, 1996 WL 374186 (July 2, 1996).  First, the ALJ must expressly consider whether the claimant has demonstrated by objective medial evidence an impairment capable of causing the degree and type of pain alleged.  *Craig*, 76 F.3d at 594.  Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record.  *Id.*  Social Security Ruling 96-7p sets out some of the factors used to assess the credibility of an individual's subjective allegations of pain, including:

1.   The individual's daily activities;

2.   The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.   Factors that precipitate and aggravate the symptoms;

4.   The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.   Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.   Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

> 7.     Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).  The determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, 1996 WL 374186, at *2.  Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. *Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984).

Neither Plaintiff nor Defendant dispute the ALJ's determination that Plaintiff "has medically determinable impairments that could reasonably be expected to cause some of the symptoms described."  (R. at 36.)  Because the objective medical evidence indicates that Plaintiff does suffer from these conditions, the ALJ properly assessed the credibility of Plaintiff's testimony about her symptoms.  *See Craig*, 76 F.3d at 585.  In fact, the ALJ explicitly mentioned evidence pertaining to Plaintiff's daily activities:

> The claimant completed a questionnaire in May 2008 regarding his functioning.  The claimant attributed his difficulties performing activities of daily living primarily to his physical maladies, rather than any mental defects.  The claimant listed watching television, sweeping the floors, dusting furniture, taking out the dogs, preparing simple meals, laundering clothes, scouring bathroom fixtures, sitting outside, watching some of the baseball games across the street, attending medical appointments, shopping for groceries, running errands, driving and caring for his personal needs as typical daily activities.

(R. at 23.)

The ALJ also discussed Plaintiff's testimony as to what aggravates his wrist pain:

> He stated that the more he uses his hands the worse his pain becomes.  The claimant noted that he felt numbness "immediately" just after grasping a fork or putting his

arms on the table.  The claimant reported that even though he thinks that his grip is "pretty good," he has had "shooting pain" when gripping items.  The claimant added that he is able to grip objects for "a few minutes."  The claimant stated that picking things up causes a strain on his elbows or wrists.  The claimant added that pulling or pushing makes his pain even worse.

(R. at 30.)  After discussing the evidence, the ALJ discussed the medical evidence cited above that was inconsistent with Plaintiff's subjective complaints.  Finally, the ALJ determined that Plaintiff "does experience joint, back, ankle and knee pain and depressive symptoms from time to time, but not to the frequency and severity alleged."  (R. at 36.)  Because the ALJ adequately supported his credibility determination with evidence from Plaintiff's own statements, as well as objective findings from the record, the undersigned finds that substantial evidence supports the ALJ's credibility determination.  Therefore, the ALJ properly did not rely on Plaintiff's testimony regarding his functional limitations from carpal tunnel syndrome.

In sum, the undersigned finds that the ALJ reasonably accounted for Plaintiff's limitations when assessing his RFC.  The ALJ did not err by not including any limitations related to Plaintiff's carpal tunnel syndrome in his RFC assessment.  Even though Plaintiff testified that his pain became worse with use of his hands, medical evidence contained in the record demonstrates that Plaintiff did not experience any functional limitations from his carpal tunnel syndrome.  Therefore, the undersigned finds that substantial evidence supports the ALJ's Step Four assessment of Plaintiff's RFC.

## b.     The ALJ Properly Relied on the VE's Testimony

If a claimant has met his burden of showing that she is not able to perform her past relevant work, the Commissioner then has the burden of showing that the claimant is able to perform work existing in significant numbers in the national economy.  *See McLamore v. Weinberger*, 538 F.2d

572, 574 (4th Cir. 1976). During the fifth step of the sequential analysis, the ALJ must pose hypotheticals to the vocational expert ("VE") that "fairly set out all of [the] claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (alteration in original); *see also Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005) (hypotheticals must "adequately" describe the claimant's impairments). However, the ALJ need only include those limitations supported by the record in the hypotheticals. *Johnson*, 434 F.3d at 659. Furthermore, an ALJ is not required to "submit to the [VE] every impairment alleged by a claimant." *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005) (alteration in original). Similarly, an ALJ is not required to accept the answers a VE gives to a hypothetical that contains limitations not ultimately adopted by the ALJ. *See Hammond v. Apfel*, 5 F. App'x 101, 105, 2001 WL 87460, at *4 (4th Cir. Feb. 1, 2001) (citing *Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1986)). As discussed above, the record contains substantial evidence that Plaintiff's carpal tunnel syndrome did not result in functional limitations. Because of this, the ALJ properly did not include any limitations related to Plaintiff's carpal tunnel syndrome or wrist pain in his hypotheticals to the VE. Therefore, the undersigned finds that Plaintiff's argument is without merit.

## 2. Substantial Evidence Supports the ALJ's Reliance on the Vocational Expert's Testimony

As his second assignment of error, Plaintiff claims that the ALJ erred in relying on the testimony of the VE regarding the jobs that Plaintiff could perform with his residual functional capacity. (Pl.'s Br. at 12-15.) Specifically, Plaintiff asserts that the ALJ erred in relying on the VE's testimony because the jobs provided by the VE are inconsistent with the ALJ's restrictions regarding environmental conditions. (*Id.*) However, the undersigned finds that Plaintiff's argument is without merit.

If the ALJ reaches the fifth step of the five-step evaluation process, "the burden shifts to the Secretary to produce evidence that other jobs exist in the national economy that the claimant can perform considering his age, education, and work experience." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (citing *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983)).  To support a finding of not disabled at this step, the Administration is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the plaintiff] can do, given [his] residual function capacity, and vocational factors."  20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2) (alterations in original).

When relying on VE testimony to support a disability determination, the ALJ is required to "[i]dentify and obtain a reasonable explanation between occupational evidence provided by [vocational experts] and information in the Dictionary of Occupational Titles (DOT)."  SSR 00-4p, 2000 WL 1898704, at *1 (Dec. 4, 2000) (alteration in original).  "When a [vocational expert] provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that . . . evidence and information provided in the DOT."  *Id.* at *4 (alteration in original).  If a conflict is apparent, the ALJ has the duty to obtain a reasonable explanation for the conflict before relying on the vocational expert's testimony. *Id.*; *see also Terry v. Astrue,* 580 F.3d 471, 478 (7th Cir. 2009) (stating that "SSR 00-4p requires the ALJ to obtain an explanation only when the conflict between the DOT and the VE's testimony is 'apparent'"); *Fisher v. Barnhart*, 181 F. App'x 359, 366, 2006 WL 1328700, at *7 (4th Cir. May 16, 2006) (stating that an ALJ abides by SSR 00-4p when he inquires on the record whether VE testimony is consistent with the *DOT*).  If the VE denies any conflicts when asked by the ALJ, the ALJ's duty ends.  *Martin v. Comm'r of Social Sec.*, 170 F. App'x 369, 374-75, 2006 WL 509393,

at *4-5 (6th Cir. Mar. 1, 2006). A claimant may bring a VE's mistake to the ALJ's attention; however, "[n]othing in SSR 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct." *Terry*, 508 F.3d at 478. However, claimants "should not be permitted to scan the record for . . . unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Young v. U.S. Comm'r of Soc. Sec.*, No. CV08-0474, 2009 WL 2827945, at *13 (W.D. La. Sept. 1, 2009) (citing *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000)).

Courts have recognized that the *DOT*'s maximum requirements do not necessarily create conflicts and that ALJs are entitled to rely on VE testimony even if the VE's conclusions differ from the *DOT*. *See, e.g., Rutherford v. Barnhart*, 399 F.3d 546, 557 (3d Cir. 2005) (despite "minor inconsistencies," VE testimony can still provide substantial evidence for an ALJ's conclusions); *Boone v. Barnhart*, 353 F.3d 203, 206 (3d Cir. 2003) (declining to adopt a "general rule that an unexplained conflict between a VE's testimony and the DOT necessarily requires reversal"). Indeed, the *DOT*'s definitions are "simply generic job descriptions that offer 'the approximate maximum requirements for each position, rather than their range.'" *Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997) (quoting *Jones v. Chater*, 72 F.3d 81, 82 (8th Cir. 1995)). The *DOT* itself warns that its descriptions 'may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities." *DOT*, vol. 1, at xiii. Therefore "not all the jobs in every category have requirements identical to or as rigorous as those listed in the DOT." *Hall*, 109 F.3d at 1259.

As an initial matter, Plaintiff should not be allowed to raise this argument in his appeal of the ALJ's decision. As noted in the record, Plaintiff's attorney had ample opportunity to cross-examine the VE at the hearing before the ALJ, and Plaintiff's attorney did so. (R. at 781-82.) However, Plaintiff's attorney did not inquire about any possible conflicts between the VE's testimony and the *DOT* and its companion volume, *Selected Characteristics of Occupations* ("*SCO*"). Therefore, Plaintiff should not be allowed to present this as "reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Young*, 2009 WL 2827945, at *13.

Here, the record is clear that the ALJ met his responsibility of inquiring of the VE whether there were any conflicts between the *DOT* and his testimony. The ALJ specifically asked: "Anything in your testimony inconsistent with anything contained in the DOT?" (R. at 780.) The VE replied in the negative. (*Id.*) Therefore, the ALJ abided by SSR 00-4p by asking the VE whether his testimony was consistent with the *DOT*. *See Fisher*, 181 F. App'x at 366, 2006 WL 1328700, at *7. The ALJ's duty ended when the VE denied any inconsistences or conflicts. *Martin*, 170 F. App'x at 374-75, 2006 WL 509393, at *4-5.

Here, substantial evidence supports the ALJ's conclusion that Plaintiff could perform certain available jobs in the national economy despite his impairments. Although Plaintiff is correct that the job of wire galvanizer can involve frequent exposure to "other" environmental conditions, *see DOT* 501.485-010, 1991 WL 673587, nothing in the record supports a conclusion that Plaintiff could not work under such conditions. Furthermore, while Plaintiff is correct that the job of equipment washer can involve occasional exposure to toxic or caustic chemicals and frequent exposure to wet and humid conditions, *see DOT* 381.687-022, 1991 WL 673259, nothing in the record suggests that

Plaintiff could have no exposure to such chemicals. Additionally, even though the ALJ limited Plaintiff to no exposure to wetness or humidity (R. at 34), the definitions of jobs included in the *DOT* contain the maximum requirements for each position instead of a range of requirements. *Hall*, 109 F.3d at 1259. Plaintiff's "'reliance on the DOT as a definitive authority on job requirements is misplaced.'" *Wheeler*, 224 F.3d at 897 (quoting *Hall*, 109 F.3d at 1259).

In sum, the undersigned finds that Plaintiff's contention is without merit. Not only should Plaintiff not be allowed to present this claim as reversible error now when he failed to raise it during the hearing before the ALJ, but the ALJ did fulfill his duty of asking the VE whether there were any inconsistences between his testimony and the *DOT*. Furthermore, Plaintiff's absolute reliance on the *DOT* is misplaced. For these reasons, the undersigned finds that substantial evidence supports the ALJ's decision to rely on the VE's testimony that Plaintiff could still work in certain jobs despite his impairments.

### 3. The ALJ Did Not Abuse His Discretion By Not Calling a Medical Expert

As his third assignment of error, Plaintiff asserts that the ALJ abused his discretion by not calling a medical expert. (Pl.'s Br. at 13-14.) Specifically, Plaintiff argues that the ALJ should have called a medical expert "[b]ecause of the complexity of the medical record and the deficiencies in the decision." (*Id.* at 14.) However, the undersigned finds this assignment of error to be without merit.

"Medical experts are physicians, mental health professionals and other medical professionals who provide impartial expert opinion at the hearing level on claims under Title II and Title XVI of the Social Security Act by either testifying at a hearing . . . or responding in writing to interrogatories." *Reynolds v. Comm'r*, No. 1:11CV340, 2012 WL 600703, at *17 (N.D. Ohio Feb.

22, 2012) (citing *Turner v. Astrue*, No. 1:10CV845, 2011 WL 4436577, at *9 (N.D. Ohio Sept. 23, 2011)). Using a medical expert or advisor is a matter left to the discretion of the ALJ. *Johnson v. Astrue*, No. 3:07-CV-00015-RJC-DCK, 2008 WL 7526174, at *7 (W.D.N.C. May 16, 2008), *aff'd by* 320 F. App'x 193 (4th Cir. 2009); *see also Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 5 (1st Cir. 1987) ("Use of a medical advisor in appropriate cases is a matter left to the [Commissioner's] discretion; nothing in the Act or regulations requires it."). "The primary function of an ME is to explain medical terms and the findings in medical reports in more complex cases in terms that the ALJ, who is not a medical professional, may understand." *Turner*, 2011 WL 4436577, at *9 (citing *Richardson v. Perales*, 402 U.S. 389, 408 (1972)).

According to the regulations interpreting the Social Security Act, an ALJ "may also ask for and consider opinions from medical experts on the nature and severity of [the claimant's] impairment(s) and on whether [the] impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart." 20 C.F.R. §§ 404.1527(f)(2)(iii); 416.927(f)(2)(iii). "'The primary reason an ALJ may obtain ME opinion is to gain information which will help him or her evaluate the medical evidence in a case, and determine whether the claimant is disabled or blind.'" *Turner*, 2011 WL 4436577, at *9 (citing HALLEX I-2-5-32 (Sept. 28, 2005)). According to the operations manual, an ALJ "may need to obtain an ME's opinion" in the following circumstances:

(1) the ALJ is determining whether a claimant's impairment(s) meets a listed impairment(s);

(2) the ALJ is determining the usual dosage and effect of drugs and other therapy;

(3) the ALJ is assessing a claimant's failure to follow prescribed treatment;

(4) the ALJ is determining the degree of severity of a claimant's physical or mental impairment;

(5) the ALJ has reasonable doubt about the adequacy of the medical record in a case, and believes that an ME may be able to suggest additional relevant evidence;

(6) the medical evidence is conflicting or confusing, and the ALJ believes an ME may be able to clarify and explain the evidence or help resolve a conflict;

(7) the significance of clinical or laboratory findings in the record is not clear, and the ALJ believes an ME may be able to explain the findings and assist the ALJ in assessing their clinical significance.

*Id.* (citing HALLEX I-2-5-34 (Sept. 28, 2005)).  The ALJ abuses his or her discretion only when the testimony of a medical expert is "'required for the discharge of the ALJ's duty to conduct a full inquiry into the claimant's allegations.'"  *Id.* (quoting *Haywood v. Sullivan*, 888 F.2d 1463, 1467-68 (5th Cir. 1989)).

Here, Plaintiff has only suggested that the ALJ abused his discretion by failing to call a medical expert "[b]ecause of the complexity of the medical record and the deficiencies in the decision."  (Pl.'s Br. at 14.)  He has only speculated that Plaintiff's sarcoidosis, chronic urticaria, hereditary angiodema, and atopic dermatitis "appear to be serious medical conditions."  (*Id.* at 13.)  Furthermore, Plaintiff suggests that if the ALJ had called a medical expert, he would have determined that Plaintiff's asthma was a severe impairment.  (*Id.* at 14.)  However, the ALJ did include Plaintiff's complaints of shortness of breath with normal spirometry as a severe impairment.  (R. at 22.)  He even included restrictions regarding exposure to temperature extremes, wetness and humidity, and environmental pollutants in Plaintiff's RFC.  (R. at 34.)

Plaintiff appears to suggest that the with the use of medical expert testimony, the ALJ should have found his asthma to meet Listing 3.00 (Respiratory System), as described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  However, on June 18, 2008, Dr. Paul Brager noted that Plaintiff had normal respiratory effort and that his lungs were clear to auscultation.  (R. at 257.)  Dr. Brager noted this

again on July 7, 2008.  (R. at 262.)  On September 3, 2008, Dr. Ronald Pearson determined that Plaintiff had normal respiratory effort and that his lungs were clear to auscultation bilaterally.  (R. at 397.)  On February 19, 2009, Dr. Sally Dee noted that Plaintiff had bilateral symmetrical breath sounds.  (R. at 439.)  On October 12, 2009, Dr. John Parker determined that Plaintiff had normal spirometry with a lung capacity of 106, residual of 133, and DLCO of 130.  (R. at 527.)  Therefore, the ALJ's determination is supported by substantial evidence as the evidence in the administrative record would not support a finding that Plaintiff's asthma either met or equaled Listing 3.00.

Moreover, the record contains extensive evidence and opinions from treating and consulting medical personnel not present at the hearing.  These opinions constitute substantial evidence when they are consistent with the record.  *See Smith v. Schweiker*, 795 F.2d 343, 345-46 (4th Cir. 1986); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984).  The medical records support the ALJ's conclusion at step three of the sequential evaluation process.  Furthermore, none of the circumstances requiring the appointment of a medical expert were present in this case, and the ALJ's conclusions are not at odds with the medical evidence and do not reveal the need for a medical expert's testimony.  Therefore, the undersigned finds that the ALJ did not abuse his discretion by failing to call a medical expert in Plaintiff's case.

### 4. The Appeals Council Did Not Err In Deciding Not to Remand Plaintiff's Case on the Basis of New and Material Evidence

As his final assignment of error, Plaintiff asserts that the Appeals Council failed to remand his case to the ALJ based on new and material evidence, that being a Functional Capacity Evaluation completed by a physical therapist and ordered by Dr. Given.  (Pl.'s Br. at 14.)  Plaintiff argues that according to *Meyer v. Astrue*, 662 F.3d 700 (4th Cir. 2011), the Appeals Council should have remanded the case for administrative findings of fact regarding the new and material evidence

submitted to the Appeals Council.  (*Id.* at 14-15.)  However, the undersigned finds this argument to be without merit.

The regulations interpreting the Social Security Act provide that when new and material evidence is submitted, "the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."  20 C.F.R. §§ 404.970(b); 416.1470(b).  Evidence is new "if it is not duplicative or cumulative" and is material if there is "a reasonable possibility that the new evidence would have changed the outcome."  *Wilkins v. Sec'y, Dept' of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (en banc), *superseded by statute on other grounds*, 20 C.F.R. § 404.1527.

Here, the Appeals Council, in its denial of Plaintiff's request for review, stated that it had considered the additional evidence, including the Functional Capacity Evaluation, but noted that "this information does not provide a basis for changing the Administrative Law Judge's decision."  (R. at 1-2.)  The ALJ issued his decision on August 24, 2010.  (R. at 39.)  However, the Functional Capacity Evaluation ordered by Dr. Given and completed by physical therapist Kevin Boring was completed on December 3, 2010 and referred to Plaintiff's "current functional capabilities," i.e., Plaintiff's functional capabilities on that date.  (*See* R. at 628-45.)  This evidence did not relate to "the period on or before the date of the administrative law judge hearing decision."  20 C.F.R. §§ 404.970(b); 416.1470(b).  Therefore, the undersigned finds that the Appeals Council properly did not remand the case based on this additional evidence.

## VI.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's applications for disability insurance benefits and supplemental security income is supported by

substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 11) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 14) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all parties who appear *pro se* and all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 17th day of August, 2012

_____
DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE